**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **DANNY CUTTER,** | ) | |
| **Y62462,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:26-cv-01096-GCS** |
| | ) | |
| **CHRISTINA VINEYARD,** | ) | |
| **LATOYA HUGHES,** | ) | |
| **WEXFORD HEALTH CARE** | ) | |
| **SOURCE, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM & ORDER**

**SISON, Magistrate Judge:**

Plaintiff Danny Cutter, an inmate of the Illinois Department of Corrections ("IDOC") who is currently detained at Centralia Correctional Center, brings this civil rights action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. Specifically, Cutter faults the defendants for failing to provide timely and adequate medical care for a detached retina.

This case is now before the Court for preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A. Under Section 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a)-(b). Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed. *See* 28 U.S.C. § 1915A(b).

## THE COMPLAINT

Cutter first sought medical care for deteriorated vision at Graham Correctional Center in March of 2024. (Doc. 1, p. 5). In April of 2024, Cutter was sent to Quantum vision center where a non-party doctor, Dr. Akduman, diagnosed him with a detached retina and scheduled surgery. After the surgery on April 16, 2024, Dr. Akduman explained that he injected a silicon oil into Cutter's eye that would need to be removed in 3-4 months. *Id.* at p. 5-6.

On June 12, 2024, Cutter transferred to Centralia and began sending request slips to the healthcare unit concerning his eye procedure and the need to have the oil removed. (Doc. 1, p. 6). In September or October of 2024 Cutter saw non-party doctor, Dr. McCollum, who promised to start the process to send him back to Quantum. On October 23, 2024, Cutter returned to Quantum and Dr. Akduman advised it was too late to remove the oil and that another procedure would be necessary. *Id.* at p. 6. Cutter underwent the second procedure on December 6, 2024, and at a follow-up visit three days later, Dr. Akduman advised that the oil must be removed in the future and noted the same in the chart. *Id.* at p. 6-7.

On April 8, 15, and May 8, 2025, Cutter sent requests to the healthcare unit about scheduling the oil removal procedure. (Doc. 1, p. 7). Though Cutter got no responses to his written queries, on May 25, 2025, he saw Dr. McCollum who promised to do his best to schedule the removal. Dr. McCollum commented that due to staffing problems and issues with the Centralia Healthcare Administrator, there were many delays for outside visits. *Id.*

On August 8, 2025, Cutter was transported to Quantum after he had filed an emergency grievance. (Doc. 1, p. 7). Upon arrival, he learned his appointment was actually a week earlier and would have to be rescheduled. On September 3, 2025, Cutter filed emergency grievances and request slips. *Id.* at p. 8. He saw a non-party doctor, Dr. Woodbridge, who had taken over at Centralia. While Woodbridge did not have Cutter's records, Cutter brought Woodbridge up to speed on the status of his care. Woodbridge initiated the outside referral process but was unsure how long it would take. *Id.*

On October 17, 2025, Cutter was taken to the wrong medical office and missed his appointment. On November 17, 2025, the transport van got a flat tire necessitating another rescheduling. (Doc. 1, p. 8). Cutter filed an emergency grievance to address the delay and to alert the healthcare administrator to the problem. Finally, Cutter saw Dr. Akduman on December 4, 2025. *Id.* at p. 9. Dr. Akduman advised that Cutter's eye was swollen, causing headaches and light sensitivity. Akduman prescribed two eye drops to reduce the irritation and provided temporary sunglasses. *Id.* Back at the prison, the transport officer threw the sunglasses away, indicating they were prohibited.

Cutter saw Dr. Woodbridge on December 7, 2025, raised the issue of light sensitivity, and asked for tinted glasses as prescribed by Dr. Akduman. (Doc. 1, p. 9). Dr. Woodbridge explained that IDOC's written policy did not allow a prescription for tinted glasses regardless of medical need. *Id.* at p. 10. When pressed further, Dr. Woodbridge merely indicated Cutter should file a grievance. Cutter saw a nurse practitioner on December 9, 2025, and he informed her that he had yet to receive the eye drops Dr. Akduman prescribed. The nurse practitioner promised weekly follow-ups, but

Cutter never saw her again. On December 16, 2025, Cutter filed a grievance about the missing eye drops. Cutter received the drops on December 29, 2025, and was transported for silicon oil removal on December 31, 2025. *Id.* at p. 11.

After surgery, Cutter was prescribed two new eye drops, but back at the prison a Jane Doe nurse would not issue new drops because she believed the December 29, 2025, drops were the same. (Doc. 1, p. 11). Cutter was advised to use the old drops which caused pain, but several nurses indicated that was normal. *Id.* At a January 5, 2026, follow-up, Dr. Akduman told Cutter to immediately discontinue use of the old drops and Akduman re-ordered the new drops. *Id.* Akduman also re-ordered tinted lenses. Back at Centralia, Cutter asked Dr. Whealon for the tinted lenses but all Whealon did was refer Cutter back to Dr. Woodbridge. *Id.* at p. 12. On January 8, 2026, Cutter received the correct eye drops. *Id.*

Cutter goes on to allege that Defendant Vineyard was the healthcare administrator responsible for scheduling appointments with outside providers. (Doc. 1, p. 12). He alleges Vineyard failed to schedule a follow-up for him from June-October of 2024, necessitating a second retina surgery. He alleges Vineyard was fully aware of his need and simply failed to perform her duty. He makes the same allegations against Vineyard for the delay after the second surgery from April 8, 2025, to November 17, 2025. Cutter also alleges Vineyard was responsible for processing Dr. Akduman's December 2025 eye drop prescription, which she failed to do from December 4, 2025, to December 23, 2025, causing him painful delay.

Cutter faults Defendant Hughes in her official capacity as the IDOC Director for maintaining a written policy prohibiting tinted eyeglasses. (Doc. 1, p. 14). He alleges the policy led to a direct denial of his prescribed glasses. He seeks permanent injunctive relief from Hughes to prevent her from enforcing the no tinted glasses policy against him. *Id.* at p. 16.

Finally, Cutter faults Wexford for failing to train and supervise Vineyard, alleging Wexford had a widespread custom of not filing vacancies for crucial roles like medical directors that left employees like Vineyard unsupervised. (Doc. 1, p. 15). He posits that this problem existed at several prisons including Pontiac, Illinois River, Hill, and Big Muddy.

In addition to permanent injunctive relief from Hughes, Cutter seeks monetary compensation from Vineyard and Wexford. (Doc. 1, p. 16).

## DISCUSSION

Cutter designated five claims in his complaint, which the Court will adopt as follows:

**Count 1:** **Eighth Amendment deliberate indifference claim against Defendant Vineyard for the delay from June 2024-October 2024;**

**Count 2:** **Eighth Amendment deliberate indifference claim against Defendant Vineyard for the delay from April 8, 2025-November 17, 2025;**

**Count 3:** **Eighth Amendment deliberate indifference claim against Defendant Vineyard for the delay from December 4, 2025-December 23, 2025, in providing Cutter's prescription eyedrops;**

**Count 4:** **Official capacity policy claim against Defendant Hughes for maintaining a policy that prohibits prescription tinted glasses;**

**Count 5:** ***Monell*** **claim against Wexford for failing to supervise or train Vineyard and for maintaining a custom of not filling key positions such as those that would supervise Vineyard.**

The parties and the Court will use these designations in all future pleadings and orders unless otherwise directed by a judicial officer of this Court. Any claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly* pleading standard.[1]

Under the Eighth Amendment, inmates are entitled to adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). For the first step of the analysis, a serious medical condition "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Some of the indications of a serious medical condition include if left untreated whether it could result in "further significant injury or unnecessary and wanton infliction of pain," it "significantly affects an individual's daily activities," or it features "chronic and substantial pain." *Gutierrez v.*

---

[1] *See, e.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (noting that an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face.").

*Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (cleaned up). At the second step, to determine if a medical professional acted with deliberate indifference, courts look to the provider's subjective state of mind. *See Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016). An inmate need not show that a doctor explicitly intended harm or believed it would occur, but he must show more than negligence, medical malpractice, or even objective recklessness. *Id.* Deliberate indifference is a culpability standard akin to criminal recklessness. *See Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021).

Cutter's allegations against Vineyard about the three delays in treatment are sufficient to proceed beyond initial review. Though it is not clear if Vineyard was merely an administrator or someone with any kind of medical training, Cutter alleges that she knew of Dr. Akduman's orders for follow-up surgeries and prescription drops, and yet she knowingly failed to schedule the prescribed care. Cutter alleges he sent countless request slips to the medical unit and filed several grievances seeking care. Cutter also associates the delays with the need for an additional surgery and with unnecessary pain and headaches when his eyes swelled and became sensitive without timely follow-up care. These allegations are sufficient, and Counts 1-3 shall proceed against Vineyard.

Cutter may also proceed against Defendant Hughes in her official capacity seeking permanent injunctive relief to allow him to possess the prescribed tinted glasses. Defendant Hughes is a state employee named in her official capacity so the Court must consider if she is even subject to this claim because the IDOC is protected from suit by sovereign immunity under the Eleventh Amendment. *See, e.g.*, *Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2012) (stating that "plaintiff sued the defendants in their official

capacity, and so the lawsuit is against a state agency"). The Eleventh Amendment generally bars private suits in federal court against a state for monetary damages. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989); *MCI Telecommunications Corp. v. Illinois Bell Telephone Co.*, 222 F.3d 323, 336 (7th Cir. 2000). That immunity extends to state agencies as well and, subject to the *Ex Parte Young* doctrine, to state employees acting in their official capacities. *See, e.g., MCI Telecomm.*, 222 F.3d at 336–337 (discussing *Ex Parte Young*, 209 U.S. 123 (1908)). Under the exception outlined in *Ex Parte Young*, the Eleventh Amendment does not bar a lawsuit against an individual state official in their official capacity for an ongoing violation of federal law if the remedy sought is prospective injunctive or declaratory relief. *See, e.g., MCI Telecomm.*, 222 F.3d at 345 (stating that "a private party may sue individual state officials in federal court to obtain prospective relief for an ongoing violation of federal law."). The *Ex Parte Young* doctrine applies in this case, which means that Cutter may proceed against Hughes on his theory that the no-tinted lens ban violates his Eighth Amendment right to adequate medical care for a serious medical need.

Finally, Cutter faults Wexford for failing to train or supervise Vineyard, and/or for maintaining a custom of not staffing key roles such as the medical director that would supervise Vineyard. Wexford is a private corporation that cannot be held liable under § 1983 unless the alleged violation was caused by an unconstitutional policy or custom of the corporation itself. *See Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014); *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Thus, under *Monell*, for Cutter to recover from Wexford, he must show that the alleged

constitutional violation was caused by: (1) an express policy that caused a constitutional deprivation when enforced; (2) a widespread practice that was so permanent and well-settled that it constituted a custom or practice; or (3) a person with final policymaking authority. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). In other words, a plaintiff must show that "systemic and gross deficiencies in . . . [IDOC's] medical care system," caused his injury, and also that "a policymaker or official knew about these deficiencies and failed to correct them." *Daniel v. Cook County*, 833 F.3d 728, 735 (7th Cir. 2016). Alternatively, a plaintiff must show that "the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016). The rigorous causation standard for *Monell* claims demands that an inmate establish a direct causal link between the challenged municipal action and the violation of his rights. *See Dean*, 18 F.4th at 235. Wexford cannot be held responsible via *respondeat superior* liability for potential misdeeds of individual employees, so these allegations are insufficient to proceed under *Monell*. *See, e.g.*, *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014) (noting that a private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by the corporation itself, and not simply by acts of its employees).

Cutter's allegations against Wexford fail because he has not demonstrated beyond speculation that Wexford is actually responsible for the isolated misdeeds of Vineyard. He does not indicate that he or any other inmates have ever notified Wexford of problems with Vineyard, instead just generically asserting that she either was not trained or was

not supervised. Because Wexford cannot be held liable purely for the misdeeds of its employees, the failure to train and supervise aspects of the claim fails. *See, e.g.*, *Flores v. City of South Bend*, 997 F.3d 725, 731-734 (7th Cir. 2021) (summarizing case law on *Monell* failure to train claims against municipalities and concluding a failure to train theory may be available if a plaintiff alleges that a municipality failed to train staff in light of a *known* pattern of criminally reckless conduct). Additionally, though Cutter alleges that Wexford also failed to staff a medical director, and that this issue was widespread, he does not provide a clear causal link between the lack of a director and Vineyard's individual actions beyond speculating that this perpetuated the problem with no training or oversight of Vineyard. Though Cutter claims the lack of staffing issue impacted multiple facilities, he does not allege that it caused problems like his with healthcare administrators at other prisons. Cutter's allegations are simply too threadbare to proceed against Wexford, and Count 5 will be dismissed without prejudice.

## Disposition

**IT IS HEREBY ORDERED THAT Counts 1-3** of the Complaint may proceed against Defendant Vineyard in her individual capacity, and **Count 4** may proceed against Defendant Hughes in her official capacity. By contrast, **Count 5** against Wexford is insufficient to state a claim, and the Clerk of Court shall **TERMINATE** Wexford. Cutter's Motion for Service of Process at Government Expense (Doc. 3) is **GRANTED** because he was granted *in forma pauperis* status in this case. The Court will now conduct service on Cutter's behalf.

The Clerk of Court is **DIRECTED** to prepare for Defendants Christina Vineyard and Latoya Hughes (official capacity only): (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint (Doc. 1), and this Memorandum and Order to Defendants' place of employment as identified by Plaintiff. If Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on Defendant, and the Court will require Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merits Review Order.**

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under Section 1915, Plaintiff will be required to pay the full amount of the costs,

regardless of whether his application to proceed *in forma pauperis* was granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that he is under a continuing obligation to inform the Clerk of Court and each opposing party of any address changes; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than 14 days after a transfer or other change of address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for failure to prosecute. *See* FED. R. CIV. PROC. 41(b).

Based on the allegations in the Complaint, the Clerk of Court is **DIRECTED** to enter the standard qualified protective order pursuant to the Health Insurance Portability and Accountability Act.

**IT IS SO ORDERED.**

**DATED: November 5, 2026.**

Digitally signed by Judge Sison
Date: 2026.11.05 14:02:51 -06'00'

**GILBERT C. SISON**
**United States Magistrate Judge**

## NOTICE TO PLAINTIFF

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least 60 days from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take 90 days or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.

The Court wishes to remind the Plaintiff that litigation is often viewed a series of hurdles that the Plaintiff must clear to get to another hurdle. Initial screening is such a hurdle, but it is a very low one for the Plaintiff to clear. As noted above, surviving initial screening only requires the bare statement of a claim that, if proven, could entitle Plaintiff to some relief. At trial, he will need to prove by a preponderance of evidence that the facts alleged actually occurred and that those facts satisfy the legal requirements for recovery. Trial is the highest and most difficult of hurdles for any Plaintiff to clear.